## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Federal Election Commission, Plaintiff, | ) | |
| | ) | Case No. 1:05cv01851 (RMU) |
| v. | ) | |
| | ) | Next scheduled deadline: December 23, 2005, |
| The Club for Growth, Inc., Defendant. | ) | opposition to motion to dismiss |

### THE CLUB FOR GROWTH, INC.'S MOTION TO DISMISS
### THE COMPLAINT FOR LACK OF JURISDICTION
### AND SUPPORTING MEMORANDUM OF LAW

The Federal Election Commission ("FEC" or "Commission") has violated the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.*, as amended ("FECA"), by rushing to Court without satisfying the jurisdictional preconditions to litigation imposed by Congress. The Club for Growth, Inc. ("Club") hereby moves, pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss the Complaint. The Club demonstrates below that:

- The FEC Commissioners prematurely voted to authorize this action before any attempt at conciliation and failed to determine for themselves that conciliation had failed, thus violating 2 U.S.C. §§ 437g(a)(4)(A)(i), 437g(a)(6)(A), & 437c(c).

- The FEC refused to conciliate on the "alternative" findings made, much less to make a good faith effort to reach agreement, thus violating 2 U.S.C. § 437g(a)(4)(A)(i).

- The Commission failed to provide timely notice of the underlying administrative complaint in violation of 2 U.S.C. § 437g(a)(1).

The FEC's failure to comply with FECA's administrative procedures deprives this Court of jurisdiction and the Complaint must be dismissed.

Specifically, as fully demonstrated below, the Commission voted to authorize suit *before* determining that conciliation was "unable to correct or prevent any violation," in contravention of FECA's express language and the FEC's own regulations. *See* 2 U.S.C. § 437(g)(a)(6)(A); 11 C.F.R. § 111.19(a) & (b). In doing so, the Commission improperly delegated the task of determining the efficacy of the conciliation proposals to the General Counsel, who exacerbated

-1-

this violation by failing to conciliate on one of the two alternative violations alleged by the Commission and by otherwise failing to negotiate in good faith. Both of these violations came on top of the Commission's failure to provide timely notice of the administrative complaint in violation of the precise requirement embodied in the statute's plain language.

This systematic failure to adhere to the express prerequisites to suit is particularly troubling because Congress designed those safeguards precisely to avoid the chilling effect inevitably engendered by costly and burdensome government litigation against those, like the Club, who are engaged in core political activity. As the D.C. Circuit has repeatedly made clear, the need for providing government "officials with explicit guidelines in order to avoid arbitrary and discriminatory enforcement" is "especially stringent, and an even greater degree of specificity is required, where, as here, the exercise of First Amendment rights may be chilled by a law of uncertain meaning." *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980).

This requirement of judicial insistence on neutral safeguards is especially compelling here because the FEC's enforcement action arises in suspicious circumstances. The Club has been operating openly and publicly under Section 527 of the Internal Revenue Code, and the FEC historically has tolerated similar activity by a wide range of "527s." Thus, when the original administrative complaint was filed by the Democratic Senatorial Campaign Committee, the FEC gave it little attention. The Club did not receive the timely notice demanded by FECA and the FEC's regulations, and after belated notice was given, the FEC let the matter languish, with no further communication to the Club for nearly a year and a half.

In the meantime, proponents of regulation were putting increasing political pressure on the FEC to "do something" about 527 organizations. The FEC attempted a rulemaking, but

ultimately announced that it would not promulgate new rules to guide and regulate 527 organizations.  69 Fed. Reg. 68056, 68065 (Nov. 23, 2004).  Criticism mounted as prominent proponents of campaign finance regulation accused the FEC of permitting the law to be circumvented and sued the FEC to force additional regulation.  *See Shays v. FEC*, No. 04-1612 (D.D.C. filed Sept. 14, 2004); *see also Lott, McCain Writing New Section 527 Bill*, BNA Money Politics Report (Jan. 26, 2005) (In addition to proposed legislation regulating 527 organizations, the "FEC's actions on the Section 527 issue also are being challenged in court in a separate case backed by campaign reformers.  The reform supporters including McCain, say the FEC has not gone far enough to assert its authority over all Section 527 organizations that seek to collect unlimited contributions to influence national elections.")  The agency was under intense pressure to take some action.

Many 527 organizations are closely allied with one of the two major political parties.  This complicated FEC regulation because the Commission is divided evenly between Democrats and Republicans, and four affirmative votes are necessary to move an enforcement matter forward.  The Club was vulnerable, however, because it attacks anti-growth policies by members of both parties, terming some powerful legislators "RINOs" – Republicans In Name Only.

In this highly-politicized context, the FEC suddenly revived the administrative complaint against the Club.  After a rushed investigation, the Commissioners voted to simultaneously (i) find "probable cause" that, on "alternative" theories, the Club had violated FECA and (ii) authorize the FEC General Counsel's Office to initiate litigation, even though the conciliation period mandated by FECA had not yet started.  The FEC then refused to conciliate on the findings as truly "alternative" grounds and demanded that the Club admit to mutually inconsistent violations.

Although the Club always had intended and believed that it operated within the law, it had made the pragmatic decision to reduce the potential for conflict with the FEC and already had begun modifying its operations. Thus, despite the FEC's positions, the Club made serious efforts to conciliate. When the FEC made clear that it would not conciliate on the alternative finding that the Club first proposed, the Club prepared a new and substantial offer that was based on the "alternative" theory preferred by the FEC. The Club also offered to continue to toll the statute of limitations pending conciliation.[1]

FECA authorizes conciliation for up to 90 days and the FEC often extends that period where the respondent consents and tolls the statute of limitations. Here, however, the FEC cut the 90-day period short, summarily rejected the Club's proposal without making a counteroffer, and simultaneously filing this lawsuit. That action was taken without any vote by the Commission members that conciliation had failed and litigation was necessary. As a result, confidential conciliation was terminated, the Club was publicly accused of violating the law, and the FEC could demonstrate to its critics that it was going after a 527.

This is not the first time that the FEC has rushed to replace confidential internal proceedings with highly-public litigation. When it did so in ways that "plainly" and "unquestionably" violated the law, the D.C. Circuit commented:

> We cannot help but question why the FEC [did this.] We would hope that its strident opposition is not politically motivated nor compelled by some vindictive desire to publicize allegations that are yet to be established.

*In re: Sealed Case*, 237 F.3d 657, 668 (D.C. Cir. 2001). Nor is the FEC the only agency to seek to escape statutory demands for confidential conciliation by prematurely resorting to the courts.

---

[1]     The Club anticipates that the FEC will admit the essential facts in its response to this motion, though it may characterize some facts differently. To the extent the FEC contests the facts, the Club also requests a brief period of jurisdictional discovery.

Similar conduct by the Equal Employment Opportunity Commission ("EEOC"), whose enforcement procedures parallel those governing the FEC, triggered the Eleventh Circuit to observe: "The chronology of events in this case lend themselves to the interpretation that the Commission's haste may have been motivated, at least in part, by the fact that conciliation, *unlike litigation*, is not in the public domain." *EEOC v. Asplundh Tree Expert Co.,* 340 F.3d 1256, 1261 n.3 (11th Cir. 2003).

The Club does not argue, of course, that prior misdeeds by the FEC and EEOC prove intentional misconduct here, or that the Court must assess the subjective intent of the agency in authorizing suit. Instead, the Club's point is that the structure of the statute permits abuse and, accordingly, demands careful judicial scrutiny to assure that Congress' strong desire to avoid unnecessary and burdensome civil enforcement is not frustrated. In this case, the essential preconditions to suit were not met, the FEC's public charges against the Club are not lawful, and this case must be dismissed for lack of jurisdiction.

## ARGUMENT

**1. <u>Legal Background</u>: Because Of The Constitutional And Political Values At Stake, Congress Has Established In FECA Enforcement Procedures That The FEC Must Follow Before Bringing A Court Action.**

FECA is not an ordinary statute, and the FEC is not an ordinary agency. Thus, it is useful to sketch the legal context before detailing the facts on which this Motion is based.

The First Amendment commands that "Congress shall make no law … abridging the freedom of speech." Nevertheless, FECA imposes and the FEC enforces complex and burdensome restrictions on the very types of public speech the First Amendment was adopted to protect. 2 U.S.C. § 431 *et seq.* Most relevant here, FECA generally forbids a corporation to pay for explicit campaign advocacy unless it is an incorporated "political committee," in which case

such advocacy is subject to a plethora of burdensome and intrusive restrictions.  *See* 2 U.S.C. §§ 441b(a), 432-34.

Recognizing the *extraordinary* constitutional and political sensitivity of laws regulating core First Amendment speech, Congress sought to assure that regulated entities be subjected to costly, burdensome litigation only after confidential conciliation has been fully pursued.  *See id.* § 437g(a)(4)(A)(i).  It therefore permitted public judicial enforcement actions only after a bipartisan determination that negotiation had failed.  *See id.* § 437g(a)(6)(a).

To that end, Congress established a six member Commission, directed that no more than three members could be from any one political party, and forbade the Commission from acting on non-ministerial matters except on the affirmative vote of at least four members.  *Id.* § 437c(a)(1) & (c).  Moreover, Congress mandated that the specified votes be made by the bipartisan Commission itself and specifically forbade the Commission from delegating that power.  *Id.* § 437c(c).  Congress then spelled out a multi-stage confidential process of investigation and conciliation, with affirmative votes of four Commissioners required to move from stage to stage.  *Id.* § 437g(a)(1)-(12).  The process begins by serving an administrative complaint on a respondent within five days after the Commission receives it and inviting a response.  *Id.* § 437g(a)(1).  As outlined in *Kean for Congress Committee v. FEC*, No. 04-0007, 2005 WL 2692490, at *2 (D.D.C. Jan. 25, 2005), an FEC enforcement matter then proceeds as follows:

> [1]  The FEC first reviews the complaint and any responses to it. Then, usually following a recommendation from the General Counsel of the FEC, the Commission votes whether there is "reason to believe" that a violation of FECA has occurred.  *See* 2 U.S.C. § 437g(a)(2).
>
> [2]  If four of the six members of the Commission vote to find a "reason to believe," then the FEC will conduct an investigation.  *Id.*  After the investigation is completed, the six members of the

Commission again vote, but this time to determine whether there is "probable cause" to believe a violation of FECA has occurred. *See* 2 U.S.C. § 437g(a)(4)(A)(I).

[3] Again, if at least four of the six members vote to find probable cause, the FEC will attempt to reach a conciliation agreement with the alleged violator. *Id.*

[4] If no conciliation agreement can be reached, the six member Commission can vote to institute a de novo civil enforcement action. *See* 2 U.S.C. § 437g(a)(6)(A).

If, during any of the numerous votes by the six member Commission, less than four members vote affirmatively in favor of taking action upon the complaint, then the complaint is dismissed.

Congress mandated these procedures in an effort to minimize the burdens imposed on core First Amendment rights. *See* Br. of FEC, *Williams v. FEC*, 104 F.3d 237 (9th Cir. 1996) (No. 95-55320), 1995 WL 17070069, at *20 ("these procedures were devised and made mandatory by Congress … to avoid unnecessary intrusion on First Amendment interests"); *Galliano v. U.S. Postal Service*, 836 F.2d 1362, 1370 (D.C. Cir. 1988) ("FECA's first-amendment-sensitive regime includes a procedural as well as a substantive component"). Faithful compliance with these procedures is a jurisdictional precondition to any suit, and the court must "take a hard look" to assure itself that has occurred. *FEC v. NRA*, 553 F. Supp. 1331, 1338, 1345 (D.D.C. 1983). Thus, as the FEC itself concedes: "If the Commission had filed suit without exhausting all the required procedures, *the case would have been dismissed for lack of jurisdiction*." Br. of FEC, *Williams*, 104 F.3d 237 (9th Cir. 1996) (No. 95-55320), at *20 (citing *NRA* and stating that "[t]he language of the Act by itself … requires … that [the FEC] refrain from initiating civil suit until the appropriate administrative[] proceedings have been completed") (emphasis added).

Against that legal backdrop, we now outline the relevant facts.

2.  **Factual Background**:  **After Failing To Give Timely Notice And Ignoring The Matter For 17 Months, The FEC Rushed This Case To Court, Voting To Sue Before Even Attempting To Conciliate, Refusing To Conciliate On The Findings Made, And Terminating Conciliation Before Impasse In The Face Of A Substantial Offer And An Agreement To Toll The Statute Of Limitations.**

From beginning to end, the FEC disregarded proper procedures in this case.  The key facts may be summarized as follows:

1.    On May 13, 2003, the FEC received a complaint against the Club from counsel for the Democratic Senatorial Campaign Committee.  The complaint identified only the Club as a respondent in the matter.  Exhibit 1.  The proceeding was designated Matter Under Review 5365 ("MUR 5365").

2.    On June 3, 2003, the FEC sent a letter to Stephen Moore, President of the Club enclosing the May 13, 2003, complaint and stating: "The complaint was not sent to you earlier due to an administrative oversight."  Exhibit 2.  The referenced oversight was that, on May 19, 2003, the FEC forwarded a copy of this complaint to the Treasurer of the Club for Growth, Inc. PAC ("Club PAC"), an entity that was not a respondent to the Complaint.  Exhibit 1.

3.    The Club responded to the complaint on June 6, 2003.  In doing so, the Club explicitly explained to the FEC that it was not waiving the Commission's failure to comply with its enabling statute.

> While the complaint, dated May 13, was initially forwarded to the Club for Growth, Inc. PAC, the complaint was filed against the Club for Growth.  Thus, this response is filed on behalf of the Club for Growth.  The Commission staff was notified of this problem on May 29, and a new complaint was sent to the Club for Growth on June 3, 2003.  Despite this attempt to correct its "administrative oversight", the Commission has failed to comply with … the statue and its regulations (see 11 C.F.R. § 111.5).  The Club for Growth, Inc. PAC will not respond to this complaint because it has not been named as a respondent.

Exhibit 3, n.1.

4.      On October 19, 2004, seventeen months after receiving the Club's response, the FEC found "reason to believe" a violation occurred.[2]

5.      On October 27, 2004, the FEC notified the Club of potential violations in this matter.  This notification included a "reason to believe" finding against the Club PAC, despite the fact that the Club PAC had not been named a respondent in the matter, had been served in error, and had never been afforded an opportunity to respond to the administrative complaint. Exhibit 4.

6.      Almost six months later, on March 16, 2005, the FEC announced it had found that Pat Toomey, as Treasurer of the Club PAC, had violated the law "consistent with the Commission's standard practice for treasurers of political committees."  The Commission referenced it's "previous" Factual and Legal Analysis made in connection with its "reason to believe" finding as the basis for this new finding.  At the time of the Commission's October 2004 Factual and Legal Analysis, Mr. Toomey was not Treasurer of the Club PAC.  Mr. Toomey never was given advance notice and opportunity to respond to the administrative complaint. Exhibit 5.

7.      Faced with a steadily metastasizing complaint, the Club, Club PAC and Pat Toomey, in his official capacity as Treasurer of the Club PAC, moved on April 8, 2005, to dismiss MUR 5365 because of the failure to comply with the notice and response provisions of the law.  Exhibit 6.

8.      On April 22, 2005, the General Counsel's staff informed counsel for the Club that there was no provision for the Commission to consider such a motion to dismiss and therefore

---

[2]      Ironically, the FEC found that there was no reason to believe that a violation occurred with respect to the allegation that was central to the complaint.  Exhibit 4.  Instead, the FEC used documents provided to it in connection with an unrelated litigation to make the reason to believe findings in this matter.  Those documents were not part of the administrative complaint.

the Commission would consider the motion as part of the Club's response to the Commission's

initial "reason to believe finding" that violations had occurred.  Exhibit 7.

9.      Three days later, on April 25, 2005, the General Counsel's Office provided the

Club and its PAC with a letter summarizing the General Counsel's Office recommendation of

alternative and mutually inconsistent findings to the Commission that there was "probable cause"

to believe a violation had occurred.  Exhibit 8.  The Commission has never addressed its failure

to meet the statutory requirements.

10.      In an undated letter, hand delivered to counsel for the Club on July 21, 2005, the

General Counsel of the FEC notified the Club that:

> On July 19, 2005, the Federal Election Commission
> ("Commission") found that there is probable cause to believe that
> your client, Club for Growth, Inc., violated 2 U.S.C. §§ 433, 434,
> 441(a)(f) and 441b(a), provisions of the Federal Election
> Campaign Act of 1971, as amended, by failing to register with the
> Commission as a political committee and report its contributions
> and expenditures and by knowingly accepting excessive and
> corporate contributions.  The Commission also found, in the
> alternative, that there is probable cause to believe that Club for
> Growth, Inc. violated 2 U.S.C. § 441b and 11 C.F.R. § 114.2(a) by
> making prohibited corporate expenditures.

Exhibit 9.  *See also*, FEC Complaint at ¶ 10.

11.      The General Counsel's letter also stated that that "[i]f we are unable to reach an

agreement with your client, the Commission has authorized this Office to file suit in United

States District Court."  Thus, the Commission authorized civil suit prior to entering into

conciliation with the Club and delegated total authority to negotiate the conciliation agreement to

the General Counsel's Office.  Exhibit 9.

12.      The Club has received the FEC's consent to place various exhibits constituting or

disclosing the contents of proposed conciliation agreements under seal.  A consent motion to

submit them under seal will be filed with the Court.  In light of these confidential filings, the

Club will not detail in this statement the substantial nature of its conciliation proposals. The

Club has made only such general descriptive statements as are necessary to lay out its argument.

13.    The General Counsel attached a conciliation agreement that the Commission had

approved for settlement. The proposed conciliation agreement addressed only the Commission's

first alternative finding, that the Club violated 2 U.S.C. §§ 433, 434, 441(a)(f) and 441b(a) as a

"political committee." It said nothing about the alternative and inconsistent finding that the

"Club for Growth, Inc. violated 2 U.S.C. § 441b and 11 C.F.R. § 114.2(a) by making prohibited

corporate expenditures." Exhibit 10 (filed under seal).

14.    On August 4, 2005, the Club made a substantial counterproposal to the FEC

which proposed to settle the case on the basis of the Commission's alternative finding that the

Club was a corporation. Exhibit 11 (filed under seal). This proposal was acknowledged by the

General Counsel's Office that same day. Exhibit 12 (filed under seal). During that meeting the

FEC lawyers stated that they had not been given authority to consider a proposal based on the

alternative finding that was the basis of the Club's proposal. *See also* Exhibit 13 (filed under

seal). The Club's counsel responded that the law did not permit the Commission to fail to

conciliate on the basis of findings that could dispose of the matter. *See also* Exhibit 14 (filed

under seal).

15.    On August 8, 2005, the General Counsel's Office amended the Commission's

proposed conciliation agreement by simply adding the alternative finding into the conciliation

agreement. Thus, the proposal required the Club to admit to both findings, although the

Commission expressly had labeled them as "alternative." The General Counsel's Office refused

to conciliate on the grounds of the corporate expenditure alternative. Exhibit 15 (filed under

seal). The proposed conciliation agreement had the effect of making the findings cumulative, not

alternative, and would have required the Club to cease and desist violating inconsistent findings of law.

16.    By letter dated August 11, 2005, the General Counsel's Office acknowledged that "[w]e are not, however, prepared to recommend that the Commission accept a conciliation agreement that includes only the alternative § 441b violation."  Exhibit 16 (filed under seal). The letter further explained: "The Commission is interested in resolving this matter on the political committee theory . . . .While we are willing to consider all proposals during the conciliation period, any agreement we would recommend must address the political committee violation that is central to this matter."  In short, although the Commission expressly made its "corporate expenditure" finding an "alternative" to its "political committee" finding, the staff refused to engage in conciliation on the "alternative" theory of the allegedly unlawful "corporate expenditure."

17.    On August 16, 2005, the General Counsel's Office wrote to counsel for the Club confirming that "the political committee violation was the sole theory included in the conciliation agreement approved by the Commission," and again threatening to file a civil suit against the Club unless it made a proposal on the political committee theory which the General Counsel's Office deemed to provide "a meaningful basis upon which to negotiate."   Thus, the General Counsel's Office once again refused to negotiate on the Commission's "alternative" theory and again made clear that litigation had been pre-authorized.  Exhibit 17 (filed under seal).

18.    The Club agreed to toll the statute of limitations to remove time pressure from the conciliation process and, on September 14, 2005, the Club made another proposal to the Commission.  This proposal reflected the Commission's "political committee" theory and, as

comparison with other outcomes of similar matters would show, was otherwise substantial. Exhibit 18 (filed under seal). The Club also offered to extend its agreement with the FEC tolling the statute of limitations so that the Commission would not suffer any prejudice by continued negotiation. Exhibit 19 (filed under seal).

19.     Three business days later, on September 19, 2005, the General Counsel's Office simultaneously (i) rejected the Club's offer without making any counterproposal, and (ii) filed this suit. Exhibit 20 (filed under seal). At that time the parties were not at impasse and neither side had provided the other with a best and final offer.

20.     Members of the Commission did not determine by an affirmative vote of four that it was not able to conciliate with the Club or that, in light of the Club's conciliation position, litigation should be authorized.

**3.   The FEC Commissioners Voted To Authorize This Action Before Any Attempt At Conciliation, And Failed To Determine For Themselves That Conciliation Had Failed, Thus Violating 2 U.S.C. §§ 437g(a)(4)(A)(i), 437g(a)(6)(A), and 437c(c).**

Litigation destroys the confidentiality the law has mandated to that point, frustrates the preferred means of enforcing FECA, and exposes the respondent to a highly public official accusation. Consequences for the respondent can be severe. Funding is threatened, political associations are jeopardized, cautious public officials keep their distance, and core First Amendment activity is chilled. Moreover, already busy courts get busier. But for the FEC, a lawsuit allows a public demonstration of enforcement resolve.

FECA could not be clearer that the Commission cannot vote to authorize litigation until mediation has been attempted and has failed. After mandating that conciliation be attempted for "at least 30 days" in every case, 2 U.S.C. § 437g(a)(4)(A)(i), FECA continues:

> *If the Commission is unable* to correct or prevent any violation of this Act … by the methods specified [above], the Commission

> may, upon an affirmative vote of 4 of its members, institute a civil
> action ….

2 U.S.C. § 437g(a)(6)(A) (emphasis added).  Thus, the precondition to the power to authorize

suit is actual, demonstrated inability to conciliate successfully.

The Commission's own regulations reinforce that attempted conciliation must precede

any vote on whether to authorize suit.  11 C.F.R. § 111.19 (emphasis added) provides:

> (a)  *If no conciliation agreement is finalized* … the General
> Counsel may recommend to the Commission that the Commission
> authorize a civil action ….
>
> (b)  *Upon recommendation of the General Counsel*, the
> Commission may, by an affirmative vote of four (4) of its
> members, authorize … a civil action ….

The FEC has explicitly represented to the courts that *conciliation must precede a vote to

litigate*: "the Commission is not empowered even to consider filing a lawsuit until all the

administrative procedures required by 2 U.S.C. § 437g(a), *including conciliation*, have been

exhausted."  Br. of FEC, *Williams*, 104 F.3d 237 (9th Cir. 1996) (No. 95-55320), at *20

(emphasis added).  And the courts have read the law the same way.  *See Kean for Cong. Comm.*,

2005 WL 2692490 at *2 (if "no conciliation agreement can be reached, the six member

Commission can vote" to authorize suit); *Alliance for Democracy v. FEC*, 355 F. Supp. 2d 39, 41

(D.D.C. 2004) (if "the Commission is unable to resolve the matter through voluntary

conciliation, the Commission may vote" to sue); *Hagelin v. FEC*, 332 F. Supp. 2d 71, 74 (D.D.C.

2004) ("if conciliation fails, the FEC votes on whether to initiate a civil action"), *rev'd on other

grounds,* 2005 U.S. App. LEXIS 10825 (D.C. Cir. 2005); *Buchanan v. FEC*, 112 F. Supp. 2d 58,

62 (D.D.C. 2000) ("[i]f conciliation fails, the FEC then takes a third vote to determine whether

the FEC will institute a civil action").

The law is equally clear that the decision that conciliation has failed and litigation should ensue must be made by the Commissioners themselves. Both the statute and the regulation are explicit that the Commission must authorize litigation by an affirmative vote of four members. 2 U.S.C. § 437g(a)(6)(A); 11 C.F.R. § 111.19(b). Congress' intent to require bipartisan decisions at key points is bolstered by an express prohibition of delegation. 2 U.S.C. § 437c(c) provides that a "member of the Commission may not delegate to any person his or her vote or any decision making authority or duty." *See also Comm. to Elect Lyndon La Rouche v. FEC*, 613 F.2d 834, 847 n.22 (D.C. Cir. 1979) (requiring compliance with voting/non-delegation rules before the staff could conduct field interviews); *see generally Tabor v. Joint Bd. for the Enrollment of Actuaries*, 566 F.2d 705, 708 n.5 (D.C. Cir. 1977) (collecting authority that agencies may not delegate authority when expressly prohibited to do so by Congress). Thus, the Commission cannot delegate this vote.

The Commission here flatly violated these provisions. Its vote to sue was taken before conciliation had been attempted. And that vote delegated to the General Counsel's Office the decision of whether conciliation had failed and, ultimately, whether to file suit. Both the failure to vote after conciliation and the attempted delegation were unlawful and highly prejudicial given the negotiating commitment and flexibility displayed by the Club.

A valid Commission post-conciliation vote is an essential precondition to suit. *See* 2 U.S.C. § 437g(a)(6)(A). Because no such vote occurred, this Court lacks subject matter jurisdiction and should dismiss.

**4. The FEC Refused To Conciliate On The "Alternative" Findings Made, Much Less To Make A Good Faith Effort To Reach Agreement, Thus Violating 2 U.S.C. § 437g(a)(4)(A)(i).**

It is clear that "a good faith, affirmative attempt to conciliate every allegation included in the judicial complaint" is a precondition to suit. *NRA*, 553 F. Supp. at 1339. Thus, before

jurisdiction can be sustained, "it is essential that the Court take a hard look at … the FEC's attempts to conciliate." *Id.* at 1338.

In this case, the FEC fell short of meeting its conciliation obligation in two ways. First, it failed to conciliate on the expressly "alternative" findings actually made. Instead, it insisted that the Club either conciliate only on one of the alternatives and not the other *or* admit to both theories of violation, even though they were mutually inconsistent. Second, the FEC did not conciliate in good faith in a genuine effort to resolve the matter. In the face of a substantial offer from the Club, combined with an agreement to toll the statute of limitations, the FEC cut discussions short without impasse and without a best and final offer from either side, even though the 90 days that FECA allocates for conciliation had not passed. For each of these reasons, the preconditions to suit would not have been satisfied, even if the Commission members had voted to terminate conciliation and resort to public litigation.

### (a) FECA demands good faith conciliation on each finding of probable cause.

The Commission's obligation to conciliate in good faith is plain from the Act. Section 437g(a)(6)(A) permits the Commission to authorize suit only "[i]f the Commission is *unable* to correct or prevent any violation" by conciliation (emphasis added). This statutory standard of outright *inability* to conciliate successfully clearly requires both that the Commission conciliate and, having done so, conclude that it is "unable" to reach an agreement curing the alleged problem. At a minimum, this standard of inability requires that the FEC make a good faith effort.

This express language is plainly construed by the Conference Report accompanying FECA's 1976 amendments, H.R. Rep. No. 94-1057, at 45 (1976) (Conf. Rep.). The Report explains that the FEC "is *required* to make *every endeavor* to correct or prevent the violation by informal methods prior to instituting any civil action." *Id.* (emphasis added). At minimum,

"every endeavor" calls for a good faith effort to reach agreement on the probable cause findings the Commission has made.

The dual requirement to conciliate on each finding, and to do so in good faith before bringing suit, is confirmed by precedent arising under similar procedures governing the EEOC's ability to sue. *NRA*, 553 F. Supp. at 1344; *see* 42 U.S.C. § 2000e-5(f)(1) ("If the Commission has been unable to secure [an acceptable] conciliation agreement…, the Commission may bring a civil action"). That provision requires the EEOC to "make a genuine effort to conciliate with respect to each and every" claimed violation, *EEOC v. Sears, Roebuck and Co.,* 650 F.2d 14, 19 (2$^d$ Cir. 1981), and to "respond[] in a reasonable and flexible manner to the reasonable attitudes of the [respondent]." *EEOC v. Klingler Elec. Corp.*, 636 F.2d 104, 107 (5th Cir. 1981). If an agency rushes to litigation before it is clear conciliation cannot succeed, the law requires "dismissal." *Asplundh*, 340 F.3d at 1261.

Indeed, unlike the EEOC context, the FEC's conciliation obligation was concededly intended to mitigate the chilling effect of FECA on core First Amendment rights, such as the Club was exercising here. *See* Br. of FEC, *Williams*, 104 F.3d 237 (9th Cir. 1996) (No. 95-55320), at *20. Full compliance is an essential precondition to the FEC's authority to bring suit, shifting the case from confidential conciliation with an agency committed to seeking agreement to public adversary proceedings. *Id.* In this case the precondition was not met.

**(b) The FEC Refused To Conciliate On Their Own "Alternative" Findings.**

In finding probable cause to believe that the Club had violated FECA, the FEC explicitly relied on "alternative" findings. Exhibit 8. One of these alternatives was that the Club was an ordinary corporation that had made forbidden "expenditures" – i.e., payments for ads that expressly advocated the election or defeat of a candidate. *See FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 248-49 (1986). The other "alternative" was that the Club allegedly was a

political committee, in which case the alleged violations lay in failing to register, report, and refuse corporate and various other contributions.

Notwithstanding the alternative nature of these findings, the FEC's initial conciliation proposal was based solely on the political committee theory. The Club responded with an offer based on the corporate expenditure theory. The FEC staff then told the Club that they could not entertain such a proposal; they were authorized only to conciliate on the political committee theory. The Club protested that, having made alternative findings, the FEC was required to conciliate on the alternative bases.

The FEC responded by proposing a conciliation agreement that treated the findings as cumulative, rather than alternative. It would have required the Club to admit to both of the mutually inconsistent alternatives. The staff made clear that no proposed conciliation agreement that addressed only the alternative corporate finding would reach the Commission.

In short, the General Counsel's Office flatly refused to take seriously the "alternative" nature of the Commission's own probable cause findings or to conciliate on that basis. Instead, it proceeded as if the Commission's only findings were based on the political committee theory. It flatly refused to resolve the matter on the corporate expenditure theory, even though that was one of the two alternatives the Commission had relied upon to find probable cause. This failure to conciliate on the findings made by the Commission is contrary to FECA § 437g(a)(4)(A)(i) and defeats an essential precondition to suit.

Moreover, even with respect to the political committee theory, the General Counsel refused to negotiate in good faith. Faced with the FEC's position, the Club concluded that, if it hoped to reach agreement, it would have to revise its position on conciliating the political committee accusation. This was difficult because it could involve a radical change in the Club's

future operations – the Club had never purported to be a political committee or to operate within that framework.  However, the Club developed and, on September 14 presented to the Commission, a substantial proposal based on the political committee theory.  The Club also indicated its willingness to agree to further toll the statute of limitations to permit negotiations to continue.  However, three business days later, the General Counsel's Office simultaneously rejected the Club's proposal and filed this action.

**(c)  The FEC Also Failed To Conciliate In Good Faith.**

The FEC cannot discharge its conciliation obligations by going through the motions.  Instead, it must make a genuine effort to reach agreement, responding flexibly to the proposals of the respondent, with a commitment to reach agreement if reasonably possible.  *See supra* at 4.(a).

That did not occur here.  The FEC's lack of commitment to conciliation was clearly signaled when the Commission voted, contrary to the statute, to authorize suit before conciliation even had begun.  It was confirmed when the staff presented a draft based on only one of two alternative FEC findings and, in substance, took a "take it or leave it" position.

Even when the Club acquiesced and made a proposal based on the FEC's preferred political committee theory, the FEC made no genuine response.  Although the Club had made clear that it was open to continued discussion and had offered to toll the statute of limitations to remove any time pressure, the FEC made no counterproposal.  Instead, it simply announced that the Club's offer was inadequate and that the Commission would sue.  The FEC took this action even though neither side had made a best and final offer and the 90 days FECA authorizes for conciliation (a period often extended by agreement) had not expired.

What occurred here was very different than in the typical FEC conciliation.  It is common for multiple offers and counteroffers to be exchanged.  The terms ultimately agreed upon often are a fraction of the penalty initially proposed.  If the respondent and the staff reach an impasse,

the situation is reported to the Commission, which sometimes will direct the staff to compromise further.  Here, so far as appears, the Commission simply approved an initial proposal and delegated to the staff the decision of what to conciliate and when to sue if the Club failed to acquiesce.

If members of the Commission had reviewed the status of conciliation and voted that conciliation could not be achieved, the Court would have to consider what weight to give that judgment.  But that did not occur.  Instead, the record presents prejudgment by the Commission members followed by a staff that was simply going through the motions.  Because good faith conciliation did not occur, and it is a precondition to suit, the case must be dismissed.

**5.  The Commission Failed To Provide Timely Notice Of The Underlying Administrative Complaint In Violation Of 2 U.S.C. § 437g(a)(1).**

Although the FEC ultimately developed a burning determination to rush this case to Court, it displayed little interest for nearly a year and a half after the administrative complaint was filed.  The Commission did not serve notice of the administrative complaint on the Club within the time allowed by law.  When the Club protested the late service, the Commission then sat silent for a year and a half.  Then, suddenly, it rushed to litigation as described above.  The Commission's failure to provide timely notice is an additional reason this case should be dismissed.

FECA guarantees respondents prompt notice of exactly what has been filed against them. Thus, 2 U.S.C. § 437g(a)(1) mandates that that "[w]ithin 5 days after receipt of a complaint, the Commission shall notify, in writing, any person alleged in the complaint to have committed … a violation."  This obligation is reinforced in the FEC's regulations, which specify that the complaint must be included in the notice.  11 C.F.R. § 111.5(a).

"Section 437g is as specific a mandate as one can imagine," and "the procedures it sets forth – procedures purposefully designed to insure fairness not only to complainants but also to respondents – *must be followed*…." *Perot v. FEC*, 97 F.3d 553, 559 (D.C. Cir. 1996) (emphasis added). These provisions "bind" the FEC. *Id.* Thus, in determining whether subject matter jurisdiction exists over an FEC complaint, "it is essential that the Court take a hard look at the FEC's efforts to notify the defendants of the charges." *NRA*, 553 F. Supp. at 1338. As with the EEOC's similar statute, if the agency "fails to obey" the notice requirement, "no suit may be prosecuted against that respondent regardless of prejudice." *EEOC v. Magnolia Elec. Power Ass'n*, 635 F.2d 375, 378 (5th Cir. 1981).

The FEC here simply failed in its mandatory duty to provide timely service of the administrative complaint. That is a third independent reason this case must be dismissed.

**6.  Conclusion:  This Action Must Be Dismissed.**

FECA and the FEC operate at the beating heart of our democracy. Congress intended for the FEC to act with the greatest of care and to make every effort to enforce FECA by voluntary and confidential conciliation, rather than by public litigation, and it carefully spelled out what the FEC must do before resorting to public litigation. These procedures were intended to minimize the threat to core First Amendment values. The FEC here fell short in multiple respects, forever depriving the Club of its right to confidential procedures mandated by Congress. Accordingly, jurisdiction is lacking and this case must be dismissed.

Respectfully submitted,

/s/

_____

Carol A. Laham (D.C. Bar # 415171)
Thomas W. Kirby (D.C. Bar # 915231)
Caleb P. Burns (D.C. Bar # 474923)
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000
(202) 719-7049 (FAX)

FOR THE DEFENDANT
CLUB FOR GROWTH, INC.

Date: November 23, 2005