UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Federal Election Commission, Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:05cv01851 (RMU) |
| | ) |
| The Club for Growth, Inc., Defendant. | ) |

**THE CLUB FOR GROWTH'S REPLY TO THE FEC'S
OPPOSITION TO THE CLUB'S MOTION TO DISMISS**

**1.   The FEC's Violation Of Its Statute And Regulations Is Clear.**

The FEC concedes it brought this action pursuant to a vote taken before it attempted conciliation with the Club.[1]  The FEC admits (Pl.'s Opp'n to Def.'s Mot. to Dismiss at 16 n.10) ("Op.") this sequence and timing is not what the FEC's own regulation "contemplates."  Indeed, the FEC never contests the Club's showing (Def.'s Mem. in Supp. of its Mot. to Dismiss at 14) ("Mem.") that the agency's long-standing view, shared by the courts, has been that "the Commission is not empowered even to consider filing a lawsuit until [after] conciliation."[2] Instead, except for one misconceived analogy, the FEC argues that it has no need to obey the law because it always can ratify its prior "technical" misconduct.  It is mistaken.

The FEC's only attempt to show it acted lawfully is its claim that courts allow delegation by the EEOC under a "similar" statute (Op. at 17-18 & n.12).  In fact, the FEC and EEOC statutes differ in critical respects:

---

[1]   As demonstrated by the extensive exhibits submitted by each side, this is a "factual attack" type of Rule 12(b)(1) motion.  Such a motion "may occur at any stage … and <u>plaintiff [FEC] bears the burden</u> of proof that jurisdiction does in fact exist."  *FEC v. NRA*, 553 F. Supp. 1331, 1343 (D.D.C. 1983) (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).  The FEC's assertions that it is entitled to a presumption of regularity and that preconditions may be alleged generally simply do not apply where, as here, specific essential facts have been challenged and admitted not to exist.

[2]   All emphasis herein is added unless otherwise noted.

a)  Although the EEOC provision, 42 U.S.C. § 2000e-5(f)(1), simply says "the Commission may bring" an action, the FEC provision, 2 U.S.C. § 437g(a)(6), says Commissioners "may, <u>upon an affirmative vote of 4 of its members</u>, institute a civil action for relief." The FEC creates (Op. at 17 n.12) an artificial similarity by simply omitting the underscored language from its statutory quotation, substituting an innocuous "…".

b)  The key case cited by the FEC (*id.* at 17) stressed that the EEOC statute contains <u>no</u> "denial of the power to delegate." *EEOC v. Raymond Metal Prods. Co.*, 530 F.2d 590, 594 (4th Cir. 1976). By contrast the FEC's statute explicitly <u>forbids</u> Commissioners to delegate "<u>any</u> decision making authority or duty . . . ." 2 U.S.C. § 437c(c).

Moreover, FEC enforcement regulation targets core First Amendment activity, while the EEOC's focus is on commercial activities alleged to <u>violate</u> civil rights.

In sum, the FEC's analogy to EEOC practice simply highlights the cavalier indifference of the FEC to its controlling law and obligations.[3]  The FEC's violation here is clear.

**2.    The FEC's Attempt To Trivialize Its Violations Is Unavailing.**

Unable to show that it followed the sequence of steps mandated by Congress and its own regulations – conciliation, inability to agree, consideration of litigation, filing of suit – the FEC unsuccessfully attempts to trivialize its violation.

**a.    Conciliation Is <u>Strongly</u> Favored.**

First, the FEC asserts that the 1980 amendments downgraded the importance of conciliation, so that Judge Hogan erred in citing 1976 legislative history requiring the FEC to

---

[3]    The FEC's lengthy quotation (Pl. Opp'n to Def.'s Mot. to Dismiss at 18) ("Op.") from *EEOC v. Otto*, Civ. No. HM75-690, 1976 WL 610, at *6-7 (D. Md. Feb. 20, 1976), is inexplicable. *Otto* held that, once the EEOC voted that conciliation had failed and suit should be brought, a district director's subsequent attempt to induce conciliation that met with a flat rejection by defendant did not vitiate the earlier Commission vote. *Id.*

make "every endeavor" to conciliate before resorting to litigation. *FEC v. NRA*, 553 F. Supp. 1331, 1343 n.5 (D.D.C. 1983). As Judge Hogan quoted in italics, however, the amended statute permits the FEC to consider litigation only if it is actually "*unable*" to conciliate effectively. *Id.* at 1342 (quoting 2 U.S.C. § 437g(a)(6)(A)). This demanding standard of actual inability to conciliate continues to make clear the strongly favored role of conciliation. Moreover, the 1980 amendments <u>added</u> the express requirement that the decision to end conciliation and go to litigation be "upon an affirmative vote of 4" Commissioners. *Id*.

In short, conciliation remains a <u>highly</u>-favored remedy. The circumstances under which the FEC can terminate conciliation and turn to litigation thus are carefully set by law.

**b.    The FEC Is Not Free To Disregard The Sequence And Timing of Votes Mandated By Congress By "Ratifying" the Unauthorized Litigation.**

The FEC even further trivializes the mandatory statutory sequence by asserting (Op. at 2, 12, 16 n.10) that the Commissioners can "moot" any violation and achieve the same "practical effect" as compliance by simply "ratifying" unauthorized lawsuits when they are challenged. Indeed, on the FEC's theory, the general counsel could bring suits on his own initiative with the FEC later "ratifying" his actions to moot all objection.

But a post hoc vote to <u>continue</u> agency litigation clearly reduces the likelihood the agency will pursue the preferred remedy of pre-suit conciliation. As a practical matter, once an agency is in court it likely will vote to continue there. Knowing this, Congress forbids the FEC to resort to litigation only after four Commissioners by affirmative vote find the agency actually is "unable" to reach agreement. The timing and sequence of the vote -- after at least 30 days of conciliation, before commencing litigation -- is vital to fully preserve the priority of the conciliation remedy.

The agency's claim of "ratification" falls far short. To begin with, a "ratification" vote that itself occurs at an improper time is ineffective. *FEC v. NRA Political Victory Fund,* 513 U.S. 88, 97-98 (1994) (after the time for petitioning for certiorari passed, the Solicitor General could not ratify an earlier petition filed by the FEC lawyers); *Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203, 212-13 (5th Cir. 1998) (collecting authority that ratification must occur at a proper time). Here the purported "ratifying" vote was taken after the staff already had stopped conciliating and taken the agency to court. That timing destroys the statute's intended structural guarantee that the agency will not slight the preferred course of conciliation. For that reason alone, it is ineffective.

But even if the FEC's "ratification" votes had been taken in permissible circumstances, they would not "moot" the violation. Instead, they would call for judicial analysis of whether the remedy is adequate and whether a more effective remedy is possible. The FEC's key ratification case, *FEC v. Legi-Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996), demonstrates that such votes will avoid dismissal only if the FEC demonstrates they actually provide an adequate remedy. No such showing is made here.

*Legi-Tech* arose after another case held that legislation designating two officers of Congress as non-voting *ex officio* members violated the constitutional command of separation of powers. *Id.* at 706. The FEC accepted the constitutional ruling and, because the invalid provision was severable, reorganized itself to exclude the *ex officio* members. *Id.* That action eliminated the problem prospectively but left the issue of what to do about the past two decades of Commission actions. Did 19 years of apparently valid agency action, including the *Legi-Tech* enforcement suit, have to be swept away because of the long-unchallenged presence of two non-voting observers?

Hoping to avoid chaos and massive waste, the reorganized FEC voted to ratify and reauthorize its prior actions, including the *Legi-Tech* suit. *Id.* Settled law allowed the courts to give validity even to unratified actions of bodies that violated separation of powers, *id.* at 707-08 (collecting authority), but <u>only</u> if the violation otherwise had been properly remedied. *Id.* at 708. Thus, far from treating the violations as moot, the *Legi-Tech* court examined whether the FEC's ratification was an adequate remedy. The reasons the court found the remedy was adequate there demonstrate why it is <u>not</u> adequate here.

To begin with, there was no likelihood of concrete prejudice. The separation of powers violation in *Legi-Tech*, while important as a matter of constitutional theory, was entirely conceptual in nature. The FEC itself could hardly be faulted for complying with presumptively valid legislation. No one had been targeted and no one claimed premature termination of conciliation. Indeed, the defendant in *Legi-Tech* had not pleaded the separation of powers defense. *Id.* at 707.

Importantly, the new votes actually and directly "remedied" the core violation because a constitutional body then had acted. *Id.* at 709. No other violation was alleged. Nor was there a claim that the ratification vote occurred under impermissible circumstances.

Moreover, dismissal there offered no further benefit. If some unidentified collateral prejudice persisted, it could not be corrected by dismissing because "<u>there had been no significant change in the membership of the Commission</u>[;] surely the Commissioners would have every incentive to show that they had not been 'influenced' by the … *ex officio* members;" and thus it was "virtually inconceivable that [the Commission's] decisions would differ in any way . . . ." *Id.* at 708-09. Thus, after extensive analysis, the *Legi-Tech* court decided ratification was an adequate remedy.

By contrast, in this case the FEC itself chose to violate a clear and long-understood statutory command. Thus, the agency is far more culpable than in *Legi-Tech*. Although the *Legi-Tech* court could be confident that the violation there had not been directed toward any current party, no such confidence is possible with respect to the FEC's unexplained deviation from historic practice in suing the Club.[4] Accepting the ratification and denying dismissal here would encourage further similar misconduct, a risk not present in *Legi-Tech*. Moreover, the cost of dismissal is not large here. The only judicial time invested so far is in consideration of this very issue. By contrast, *Legi-Tech* had reached the point of decision on the merits, and there was a broader threat to decades of Commission actions.

Also, and significantly, <u>the FEC votes here do not cure the core violation</u>. The essence of the statutory right claimed by the Club is a specified <u>sequence and timing</u> of actions that require the Commissioners to decide whether to continue pursuing the favored remedy of conciliation <u>while the agency is not committed to litigation</u>.[5] Congress commanded, and the Club is entitled to, a vote on whether to <u>go</u> to court, not on whether to <u>stay</u> in court. A vote taken during litigation does not cure that violation. To the contrary, the "human nature" discussed in *Legi-*

---

[4] Strikingly, the FEC has offered <u>no</u> explanation for abandoning historical practice to violate the Club's clear legal rights. Nor does the FEC deny that, at the time of its unexplained violation, (1) it was under intense political pressure to "do something" to some 527 organization, and (2) the Club was uniquely vulnerable to "bipartisan" attack because it lacked protection from either of the two major parties who hold seats on the Commission. Instead, ignoring the special solicitude that courts display for core First Amendment activity, the FEC simply urges the Court to presume that its clear and unexplained violations have some unarticulated good explanation.

[5] Because the FEC denies (Op. at 16) that its staff exercised any delegated authority to authorize this suit, there is no dispute over the identity of the decision-maker here. The FEC's claim (*id.* at 12) that the Commissioners gave the General Counsel "specific … parameters" for conciliation reemphasizes that the critical decision was made before any conciliatory give and take with the Club. Indeed, the statutory command that the FEC "shall attempt … informal methods of conference, conciliation, and persuasion," 2 U.S.C. § 437g(a)(4)(A)(i), is not satisfied by adopting formal, written, take-it-or-leave-it demands <u>before</u> any discussion has occurred. In truth, of course, the General Counsel exaggerates the guidance he was given. He still had to decide that the Commission was <u>unable</u> to reach agreement, and that decision violated 2 U.S.C. § 437c(c) (nondelegation).

*Tech*, *id.* at 708-09, inevitably predisposes the Commissioners to favor continuing the pending agency suit.[6]

Finally, in direct contrast to *Legi-Tech*, <u>there is a real prospect that dismissal here may lead to a different result before the Commission</u>. After the purported ratification, a "significant change in the membership of the Commission" occurred. *Id.* at 709. Three of the six Commissioners have been replaced. *See* Press Release, FEC, New FEC Commissioners Take Office (Jan. 9, 2006), www.fec.gov/press/press2006/20060106members.html. At least one of these new members would have to concur in any future vote to terminate conciliation and sue. A key premise of *Legi-Tech*, 75 F.3d at 709, quoted by the FEC (Op. at 14), was that, given "human nature," a new decision by the same members "promises no more detached and 'pure' consideration … than the Commission's ratification . . . ." That critical consideration points exactly the other way here.[7]

---

[6] The other ratification cases relied upon by the FEC are fully consistent with this analysis. *See Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203, 212-14 (D.C. Cir. 1998) (giving effect to ratification where doing so did not threaten any statutory policy or threaten any prejudice, there was no fault in the agency, and the court was "sure" that the outcome would be the same); *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989) (brief statement that ratification is permissible without analysis); *Communist Party v. Comm'r of Internal Revenue*, 332 F.2d 325, 329 n.5 (D.C. Cir. 1964) (dicta that, if there were doubt that a private lawyer had authority to commence lawsuit for client, client's cooperation and acquiescence would constitute ratification); *EEOC v. Nat'l Cash Register Co.*, 405 F. Supp. 562, 567-72 (N.D. Ga. 1975) (where a permissible delegation was procedurally defective and the defect was corrected and prior acts ratified, and where there was no claim of prejudice or conflict with statutory policy, no dismissal imposed); *Bowles v. Wheeler*, 152 F.2d 34, 38-40 (9th Cir. 1945) (where agency had power to delegate decision to sue and seemed to have done so, and any procedural doubt as to the delegation had been cured by ratification "without violating any substantial equity," suit could proceed); *Lambert v. Sperry Rand Corp.*, No. 19,631, 1974 WL 296, at *1-2 (W.D. La. Nov. 8, 1974) (where procedural doubt as to permissible delegation to issue "right to sue" letter had been fully cured and prior acts also ratified, and there is a "lack of prejudice" from continuing the action but otherwise the effect would be to "deprive this [private] plaintiff of a right of action," suit may continue); *Wirtz v. Atl. States Constr. Co.*, 357 F.2d 442, 444-46 (5th Cir. 1966) (dicta that, if a defect had occurred, a delegation that impaired "no congressional purpose," had been fully cured, and caused no prejudice would sustain action).

[7] The validity of any future vote to sue can be addressed if it ever occurs, and the Club expects it will not. The Court need not now attempt to anticipate and regulate the future. It is sufficient to dismiss this Complaint.

### c.     Last Minute Circulation Of A Letter To The Club Is Not Equivalent To A Proper Vote.

The FEC's suggestion (*id.* 8 & 17 n.11) that a post-conciliation/pre-suit Commission vote occurred because the staff sued "after providing each of the Commissioners with a copy of [the General Counsel's] letter to the Club's counsel indicating the Commission planned to file suit later that day" simply demonstrates how the FEC abuses any procedural leeway courts allow it. *See* Mem., Ex. 20 at 1-3.  The Commission bases its argument on *Committee to Elect Lyndon La Rouche v. FEC*, 613 F.2d 834, 848 n.22 (D.C. Cir. 1979), in which the following occurred:

> The record reveals that the Secretary of the Commission distributed the staff memorandum to the six Commissioners on January 13, 1977, that five of the six Commissioners returned the memorandum the next day without objection, and that the sixth Commissioner who did not return the memorandum nevertheless raised no objection to the proposed action. A. 59-60. On the basis of this response, the Secretary of the Commission, on January 14, 1977, certified that the Commission had adopted the staff proposal. P.A. 25.

Here, by contrast, the staff letter (Mem., Ex. 20 at 1) did not suggest that suit was contingent on Commission approval or even invite response.  Instead, it flatly stated "the Commission will file suit this afternoon."  Nor was a meaningful time for response allowed.  At most a few hours elapsed.  As its fax markings show, the letter was not sent to the Club until 12:50 p.m., and suit was filed by mid-afternoon.[8]  The letter provided an entirely one-sided summary of events that could not be fairly understood in isolation from the exchanged proposals, which the FEC does not claim to have circulated.  The Secretary did not make sure each Commissioner actually received the letter, nor did the Secretary receive responses or certify any

---

[8]     The Club has not been able to find a time stamp in the Court's records, but its records show that an FEC press release about filing the Complaint was posted on the FEC's website by about 4:00 p.m.  As the party relying on the letter, the FEC has the burden of proving the relevant facts.

resulting vote. Like most of what occurred here, the letter was no more than a pointless gesture intended to push forward a foreordained litigation.

**3.     The FEC Cannot Show That Its Violation Was Harmless.**

The FEC asserts (Op. at 17) that, "[b]ecause the Club did not come close to accepting" the Commission's proposals, complying with the statute "would have been a needless waste of time." Neither premise of that claim is true.

First, it is not true that the Commission's initial proposal necessarily defines the outcome. To the contrary, the Commission often accepts conciliation agreements that vary greatly from the initial draft. Moreover, the Commission here expressly stated that its corporate spending finding was an "alternative." An "alternative," is "a proposition or situation offering a choice between two or more things only one of which may be chosen." Merriam-Webster's Tenth New Collegiate Dictionary 34 (10th ed. 2001). Thus, in the Conciliation Agreement in MUR 5024R (attached as Ex. 1), the Commissioners' reason to believe findings were in the same "alternative" form as the findings against the Club here and were based on the very same theories of violation. After conciliation, the Commission agreed to resolve the matter based on the "alternative" theory and without any admission of wrongdoing, just as the Club proposed here. Given the Commission's express statement that its theories were "alternative," the Club reasonably believed a proposal based on the Commission's "alternative" might succeed.[9] And no Commissioner ever voted that such an alternative proposal could not be entertained.

Second, the Club displayed considerable and ongoing flexibility. When the Club discovered that the staff, emboldened by their pre-conciliation authorization to sue, would not

---

[9]     The FEC and other regulatory agencies also regularly enter into negotiated resolutions that do not admit guilt. The FEC's attempt to infer the Commission's settlement priorities from the space the General Counsel devoted to various theories in his memorandum is, to say the least, untenable.

even present such an "alternative" proposal to the Commission, the Club then prepared a proposal based on the staff's preferred theory. The FEC staff complains that the Club took a month to do so. But that month was over late August and early September. To develop its alternative, the Club had to pull its volunteer board back from summer vacation, explain why the first proposal had been rejected, evaluate what accepting the staff's preferred theory would mean for continued operations, and develop a new proposal. Even so, when the Club presented its second proposal, 30 of the 90 statutorily authorized conciliation days remained, the Club offered to toll the statute of limitations to permit continued pre-suit conciliation, and the FEC regularly conciliates for much longer than 90 days with the other party's consent. Yet, with no Commission vote, the staff abruptly terminated conciliation and filed suit.[10]

The FEC claims that, while the Club was intractable, its staff was flexible and generous in its conciliation positions. In fact, the staff initially refused to conciliate on the corporate spending finding, even though the Commissioners had expressly labeled it as an "alternative" to the political committee theory. Then, when the Club protested that the staff had a duty to conciliate on each proposed finding, the staff concocted a proposal that was more onerous than the first because it converted the Commission's "either/or" finding into "both/and," <u>requiring the Club to admit to mutually inconsistent violations</u>. Negotiating backwards and demanding logically impossible concessions is not the typical way to find common ground.

---

[10]   The FEC's suggestion (Op. at 5) that the Club should have sought conciliation earlier than it did is baseless. When the Club was notified that the FEC was proceeding with the complaint, it simultaneously was served with massive discovery demands. The Club's counsel knew from experience that meaningful conciliation could not occur until the discovery demands were resolved. Before that occurred, the FEC had found probable cause.

**4.     The FEC's Refusal To Conciliate On The "Alternative" Finding Was Also Unlawful.**

Indeed, the staff's failure to consider the Club's proposal to resolve the matter on the basis of the "alternative" finding is a further violation. The FEC does not deny that it has a duty to conciliate with respect to <u>each</u> finding. (Mem. at 17). Where, as here, accepting that finding will dispose of the entire charge – and the FEC does not deny that is the case here – the FEC has no legal authority to refuse to conciliate on that basis and then seek to litigate that charge in court.

**5.     The FEC's Charges Of Discovery Misconduct Are Baseless And Irrelevant.**

The FEC seeks to make its arbitrary behavior more palatable by suggesting it was provoked by the Club's failure to provide timely discovery. In fact the Club made a prompt written response to truly abusive discovery demands, stating what would be provided, what was objectionable, and why. It also negotiated with the Commission to find other reasonable compromises and produced what it agreed to produce.[11] If the Commission thought the Club's position unreasonable, its remedy was to seek judicial enforcement, 2 U.S.C. § 437d(b). Had the staff gone to court, the Club was fully prepared to defend its discovery positions.[12] Since the staff elected not to do so, it should not now be making assertions it elected to withhold from meaningful judicial review.

**6.     The FEC Did Not Provide Timely Notice Of The Complaint.**

The FEC's statutory violations at the end of its administrative process were foreshadowed at the outset by its failure to give timely notice to the Club and by its subsequent and still entirely

---

[11]     The Club, in fact, was preparing to produce additional materials when the FEC precipitously moved to the probable cause phase.

[12]     By requiring the FEC to seek judicial enforcement of its subpoenas, Congress guaranteed a valuable opportunity to obtain judicial oversight of governmental intrusions into core First Amendment activity. *Reader's Digest Ass'n v. FEC*, 509 F. Supp. 1210, 1214-16 (S.D.N.Y. 1981).

unexplained delay of a year and half. The FEC asserts (Op. at 27-28) that the Club effectively received timely notice because it was sent to a PAC the Club maintains and its Treasurer, and the complaint was not "specific to the PAC." Mem., Ex. 1 at 1 (enclosing a "complaint, which indicates that the Club for Growth, Inc[.] PAC ('Committee') and you, as treasurer, may have violated").

No one familiar with FEC practice could avoid smiling at this argument. The term PAC refers to a "<u>separate</u> <u>segregated</u> fund," 2 U.S.C. § 441b(b)(2)(C), and the FEC makes a fetish of separation and segregation. If a corporation inadvertently did something that only its separate segregated fund could do, the FEC would not listen for one instant to the notion that the two should be viewed as interchangeable. The FEC proceeds separately against PACs and, indeed, the FEC's "reason to believe" finding (Mem., Ex. 4 at 1) was directed to the PAC as well as the Club, even though, in the FEC's memorable words (Op. at 27-28), the complaint "was not specific" to the PAC. Particularly given the gauzy and vague administrative complaint (Mem., Ex. 4 at 1) and the FEC's explicit statement that the PAC was the respondent, the Commission did not give timely notice that the general counsel had decided to take action against the Club.

The FEC's second argument is that, even if it did not give notice within the five days mandated by statute, there is no consequence because the time is merely "directory," rather than "mandatory." But in the context of an agency regulating core First Amendment activity, a rule that would permit regulators to take delayed action would invite abuse. Accordingly, the FEC's own regulation specifies two alternatives: the General Counsel must either give timely notice to a respondent or notify the complainant that "no action shall be taken." 11 C.F.R. § 111.5.[13]

---

[13] If the General Counsel had believed that the facts recited in the Complaint were compelling, perhaps he could have proposed that the Commission issue its own complaint. 11 C.F.R. §111.3. But the fact that the FEC let the complaint sit for a year and a half suggests that, at the time, the complaint was not seen as a top priority.

**7.     Dismissal Is The Proper Remedy.**

The FEC asserts (Op. at 21, 25-26) that, if any remedy is granted, it should be a stay pending further conciliation. Judge Hogan discussed this remedial issue at length in *NRA*, 553 F. Supp. at 1337-39, 1343, 1344-46. He concluded that, where the issue is the adequacy of conciliation efforts, a stay pending further conciliation <u>might</u> suffice.[14] However, where suit was commenced "without an affirmative vote of four members of the Commission … a critical check and internal review of the FEC administrative process is obviated" and the court is "without subject matter jurisdiction." *Id.* at 1338.

Here, the FEC brought suit based on a staff judgment, unreviewed by the Commission, that conciliation could not proceed. Allowing this suit to proceed after a stay would forever deprive the Club of its "critical" right to an informed Commission vote as to whether to continue to conciliate or to <u>go</u> to court. Indeed, the Commissioners would play no role unless the staff decided to present an agreement for approval. A stay also is conceptually unsound because it permits this case to continue without the Commission ever taking a valid vote to litigate. And, a stay rewards a clear and <u>unexplained</u> violation of law by the Commission and invites further similar violations in the future. The only proper remedy is to dismiss the case.

---

[14]     Judge Hogan noted, however, that the EEOC statute expressly authorizes a stay to permit "further efforts of the Commission to obtain voluntary compliance." 553 F. Supp. at 1346 (quoting 42 U.S.C. § 2000e-5(f)(1)). Because Congress conspicuously omitted such provision from the FEC statute, and instead explicitly demanded an affirmative and non-delegated vote by the Commissioners, it is questionable to what extent the EEOC stay cases cited by the FEC (Op. at 25-26) even apply. At minimum, the difference between the FEC and EEOC statutes make a stay a less-favored remedy. Significantly, the FEC's position has been that dismissal is required. *See* Br. of FEC, *Williams v. FEC*, 104 F.3d 237 (9th Cir. 1996) (No. 95-55320), 1995 WL 17070069, at *20 ("[i]f the Commission had filed suit without exhausting all the required procedures, the case would have been dismissed for lack of jurisdiction").

-14-

        Respectfully submitted,

        /s/
    _____

Carol A. Laham (D.C. Bar # 415171)
Thomas W. Kirby (D.C. Bar # 915231)
Caleb P. Burns (D.C. Bar # 474923)
WILEY REIN & FIELDING LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000
(202) 719-7049 (FAX)

Date: January 20, 2006